### SADLER MACHINERY CO. v. OHIO NATIONAL, Inc.

Civ. A. No. 6515.

United States District Court
N. D. Ohio, W. D.

Feb. 4, 1952.

Benjamin H. Schwartz and Samuel K. Walzer, Cleveland, Ohio, Marcus L. Friedman, Toledo, Ohio, for plaintiff.

Harold A. James, Toledo, Ohio, for defendant.

KLOEB, District Judge.

This is an action by the plaintiff, a machinery dealer of Detroit, Michigan, against the defendant, a manufacturer at Upper Sandusky, Ohio, to recover the purchase price which plaintiff paid defendant for a 16" 6 spindle Bullard Mult-Au-Matic machine located at the plant of defendant at Upper Sandusky, which was severely damaged by fire while in the plant. The claim of the plaintiff is based on the allegation that the machine was purchased F. O. B. cars Upper Sandusky, Ohio; that at the time of the fire it was in the possession of defendant and had not been loaded on cars at Upper Sandusky and thereby transferred to the ownership and control of the plaintiff. The defendant contends that the title to the machine passed to the plaintiff prior to the loss.

Two questions are presented:

(1) Did title to the machine pass to the plaintiff prior to the loss?

(2) Did the loss fall on plaintiff as buyer because delay in delivery was due to the fault of the plaintiff?

We find the facts as follows:

1. During telephone conversations January 12 to 15, 1951, between Mr. Sadler, of plaintiff, and Mr. Day, of defendant, the defendant agreed to sell the plaintiff, for the sum of $25,000 a certain Bullard Mult-Au-Matic machine, then located in the plant of the defendant at Upper Sandusky, Ohio, which had been previously examined by Mr. Sadler.

2. Under date of January 15, 1951, a written contract in the form of a purchase order was mailed by plaintiff to defendant (Plaintiff's Exhibit 1), and later signed by defendant, in which the price of the ma-

654

chine was fixed at $25,000, to be paid "$4,-000.00 down—balance within ten days". The order contains the term "F. O. B. Cars Upper Sandusky, Ohio". It also contains the following with reference to shipment: "Ship To Will advise" and "Via Will advise".. The order also contains the following with reference to preparation for shipment of the machine: "Note: It is understood that you will skid the machine and prepare it properly for shipment. The counterweights to be removed and heads blocked, also all machined surfaces to be sludged to prevent rusting."

3. On January 15, 1951, after a telephone conversation with Mr. Day, at which the terms were agreed upon, the plaintiff, by Mr. Sadler, wrote to the defendant, attention of Mr. Day, a letter enclosing the purchase order and check for $4,000, which letter contained the following request that the defendant hold the machine temporarily (Plaintiff's Exhibit 3): "* * * We would like you to hold the machine for a week or two, as we may sell it direct from your plant. In that way, we can avoid extra handling cost by shipping it to our warehouse."

4. Mr. Day testified that, upon receipt of the above letter, on January 17, 1951, he telephoned Mr. Sadler and told him that the terms set forth in the purchase order did not carry out the terms of the oral agreement; that he wrote Mr. Sadler a letter under date of January 17, 1951 (Plaintiff's Exhibit 4), responding to Mr. Sadler's letter of January 15, stating that he was returning copy of the purchase order signed,

"* * * but you will note that I have changed the terms as agreed upon by telephone and that is $4,000.00 Cash, and the balance of $21,000.00 within ten days."

"One of my reasons for agreeing to sell this machine is the fact that we are cramped for space and would like to get it out of our factory as soon as humanly possible. We realize, of course, that if you can ship directly from our plant, it would mean considerable saving to you, and we are willing to go along for a couple of weeks as outlined."

5. On January 26, 1951, the plaintiff wrote a letter to the defendant (Plaintiff's Exhibit 5; Defendant's Exhibit C). which states that the plaintiff is attaching a check for $21,000 "to cover the final payment on the 16" 6 Spindle Bullard Mult-Au-Matic recently purchased from your company."

The plaintiff also referred in the letter to its desire to leave the machine in the plant of the defendant for another week or two, stating:

"We tried to contact you today, by phone, but were informed that you were out of town until Monday. The reason for trying to phone you was to ask if it would be possible to leave the machine in its present location for another week or two. If this is not possible, we will have a truck at your plant Wednesday, January 31st, to pick the machine up and take it to Cleveland, where it will be stored.

"We wish to thank you kindly for your co-operation and hope that we may have the pleasure of hearing from you the early part of next week."

6. On the same day, January 26, 1951, the plaintiff wrote a letter to the Noll Equipment Company of Cleveland, Ohio (Plaintiff's Exhibit 7), stating as follows:

"When talking with you by phone today it was agreed that you would send a truck to Ohio National, Inc., at Upper Sandusky to get the Bullard Mult-Au-Matic next Wednesday morning. You will deliver the machine to your warehouse and store it there until sold.

"We are sending Ohio National a check today to cover the balance due on this machine, so there should be no trouble in getting it released.

"Ohio National will prepare the machine for shipment and load it on your truck, therefore you won't need to send any riggers along."

7. On January 29, 1951, the plaintiff wrote a letter to Noll Equipment Company (Plaintiff's Exhibit 6), confirming a telephone conversation of that day "in which we asked you not to send your truck to The Ohio National, Inc. Plant in Upper Sandusky, Wednesday morning to get the Bullard Mult-Au-Matic which we purchased

from them. The reason for the change in plans is that Mr. Day called us today stating that it would be alright to leave the machine in their plant another two weeks."

8. The weight of the evidence is that two or three days after the sale was made the machine was prepared for shipment by defendant by being skidded and sludged, but the counterweights were not removed and the head was not blocked, for the reason that this operation was not considered by Mr. Day necessary on a machine of this particular type.

9. The fire occurred about 11 A. M., on January 30, 1951. (Plaintiff's Exhibit 11.)

10. Plaintiff's check for $21,000, dated January 26, 1951 (Friday), was apparently received by defendant at Upper Sandusky on January 29, 1951 (Monday), and mailed for deposit to defendant's bank at Cygnet, Ohio, on that day and deposited to its credit on January 30, 1951, and paid by plaintiff's bank at Detroit on February 2, 1951.

On the question of whether the title to the machine passed to the plaintiff prior to the loss, plaintiff contends that the title remained in the defendant because the purchase order provided for delivery "F. O. B. Cars Upper Sandusky, Ohio". The general rule is stated in 46 Am.Jur., Sec. 442, p. 608, as follows: "Where the contract of sale provides for a sale f. o. b. the point of shipment, the title is generally held to pass, in the absence of a contrary intention between the parties, at the time of the delivery of the goods for shipment at the point designated."

It is generally held that the term "f. o. b." standing alone in a contract simply means that the subject of the sale is to be loaded for shipment without expense to the buyer. Olsen v. McMaken & Pentzien, 139 Neb. 506, 297 N.W. 830, 832; 17 Words and Phrases, pages 199–202.

Sec. 8398 G.C.O., with reference to the time of transfer, provides that it is the intention of the parties which governs. That section states:

"*Time of transfer.* (1) When there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

"(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade, and the circumstances of the case."

We are not able to agree with counsel for plaintiff that the words "F. O. B. Cars Upper Sandusky, Ohio", necessarily mean that the title did not pass until delivery to the carrier. In this case that term would seem to mean, as intended by the parties, that the defendant was to load the machine without expense to plaintiff. That is indicated by the letter of plaintiff of January 26, 1951 (Plaintiff's Exhibit 7) to the cartage company, stating: "Ohio National will prepare the machine for shipment and load it on your truck, therefore you won't need to send any riggers along." Mr. Day testified that he agreed to load it for the accommodation of the plaintiff.

Sec. 8399 G.C.O., provides, with reference to how the intention of the parties shall be ascertained, as follows:

"*How intention of parties ascertained.* Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer:

"Rule 1. When there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed.

"Rule 2. When there is a contract to sell specific goods and the seller is bound to do something to the goods, for the purpose of putting them into a deliverable state, the property does not pass until such thing be done.

*    *    *    *    *    *

"Rule 5. If a contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not

pass until the goods have been delivered to the buyer or reached the place agreed upon."

Rule 1 of Sec. 8399 states that when there is an unconditional contract to sell specific goods (as in this case), in a deliverable state (concerning which there is a controversy), the property in the goods passes to the buyer when the contract is made, and "it is immaterial whether the time of payment, or the time of delivery, or both, be postponed."

The plaintiff contends the machine was not in a deliverable state at the time of the loss because the following operations required to be performed by defendant under the contract had not been completed: (a) The machine was to be skidded and properly prepared for shipment; (b) The counterweights were to be removed and the heads blocked; (c) All machined surfaces were to be sludged to prevent rusting. On this point plaintiff cites Bonham v. Hamilton, 1902, 66 Ohio St. 82, 63 N.E. 597. That case involved the sale of a stock of goods in a store, and the sale had not been completed because the seller (an administrator) had not approved the sureties on the security offered by the buyer, as required by law. We do not regard this case as a precedent on the facts here, for the reason that the removal of the counterweights and the blocking of the heads had to do merely with its preparation for shipment. The evidence is that this could have been done in about half a day.

We are of the opinion that the weight of the evidence indicates that the machine was sludged, skidded and prepared for shipment within two or three days after the sale. While Mr. Day testified that the counterweights were not removed and the heads blocked when the machine was shipped to defendant from New Jersey and he did not deem that necessary, we are of the opinion that inasmuch as he agreed to this in the contract, that obligation rested upon defendant before shipment, but did not affect the title.

Cases in which it has been held that title did not pass because something was still to be done to goods to put them in a deliver-

able state are distinguishable from the case at bar. A number of such instances are cited in a note to 2 Williston on Sales, p. 16, Sec. 265.

That the work of getting a heavy engine ready for shipment had not been done would not postpone the passing of the title was held by the court in Underwood v. Burgh Castle Brick & Cement Syndicate, 1 K.B. 123 (1921), (referred to in 2 Williston on Sales, p. 17, Sec. 265, note) involving the sale of an engine weighing some thirty tons which at the time of sale was affixed by bolts to concrete and to be shipped out had to be unfastened and taken to pieces. The court said (p. 125): "I do not think therefore that the fact by itself that the seller had to take the engine to pieces would postpone the time when the property passed. Many chattels have to be taken to pieces before they can be delivered, e. g. a sideboard or a billiard table; nevertheless the property in these passes on the sale and is not postponed until the article is actually taken to pieces and delivered. I do not, therefore, lay any stress on the fact of the engine having to be taken to pieces."

It has been held that the rules under Sec. 8399 O.G.C. for determining the time of passing title to goods sold are declaratory of the common law. Herring Hall Marvin Safe Co. v. Evatt, Tax.App., 1945, 16 Ohio Supp. 187.

In Leonard v. Davis, 1861, 1 Black 476, 66 U.S. 476, 17 L.Ed. 222, a leading case on the subject, the court said: "When the terms of sale are agreed on, and the bargain is struck, and everything the seller has to do with the goods is complete, the contract of sale, says Chancellor Kent, becomes absolute as between the parties, without actual payment or delivery, and the property and the risk of accident to the goods vests in the buyer. * * *"

In Briggs v. United States, 1892, 143 U. S. 346, 354, 12 S.Ct. 391, 395, 36 L.Ed 180, the court said: "By the common law a sale of personal property is complete and the title passes as between vendor and vendee when the terms of transfer are agreed upon, without actual delivery."

657

In 24 R.C.L. Sec. 298, p. 36, it is stated: "* * * As has been said there is no rule better established, both by the law of England and in this country, than that the sale of a specific chattel passes the right of property to the buyer without a delivery of possession, and he may maintain an action of detinue or replevin, or the statutory substitutes therefor such as an action of claim and delivery, on the wrongful refusal of the seller to deliver possession. And ordinarily where no further act remains to be done to identify the property sold or to ascertain the quality or quantity, and the price has been paid and the buyer entitled to take immediate possession, the title will be deemed to have passed though there has been no actual taking of possession by the buyer. * * *"

It can hardly be doubted that the plaintiff could have maintained an action to replevin the machine, at least after its check had been accepted by the defendant.

■ Counsel for defendant contend that the plaintiff is barred from recovery by reason of the provisions of Sec. 8402 (b) O.G.C., because the delay in delivery was due to its fault. This section contains the following provisions:

"*At whose risk goods held.* Unless otherwise agreed, the goods remain at the seller's risk until the property therein is transferred to the buyer, but when the property therein is transferred to the buyer the goods are at the buyer's risk whether delivery has been made or not, except that—

* * * * * *

"(b) When delivery has been delayed through the fault of either buyer or seller the goods are at the risk of the party in fault as regards any loss which might not have occurred but for such fault."

In support they cite Schenning v. Devere & Schloegel Lumber Co., 173 Wis. 20, 180 N.W. 136. There lumber sold for delivery f. o. b. at a certain siding was later destroyed by fire. The seller had written the buyer, urging immediate orders for shipment because of the danger from fire while the lumber remained piled up in the yards near the railroad track, to which the buyer replied, promising to send shipping instructions within a day or two. The trial court found that a delay of ten days in sending the shipping instructions was unreasonable and placed the fault upon the buyer under the sales statute, similar to that involved here. Counsel for plaintiff attempt to distinguish this case from the facts here on the ground that the court found there had been no acquiescence in the delay by the seller. We are of the opinion that this statute must be read as meaning that where a buyer, entitled to possession and immediate delivery, for his own purposes secured a delay in taking delivery from the seller, as in this case, the buyer is the one at fault or responsible for the delay, and that the mere acquiescence in the delay by the seller as a favor to the buyer does not change the rule as to the passing of title by the contract of sale.

Counsel for plaintiff rely principally in support of their contention on this question upon the case of Daniel Gage, Inc. v. Kimball, 1934, 288 Mass. 413, 193 N.E. 30. As we understand the facts in this case, we are unable to follow the reasoning of the court as applied to the case we have here.

Conclusions of Law

■ 1. The title to the machine was in the plaintiff prior to and at the time of the fire.

■ 2. The delay in delivery was chargeable to the plaintiff.

3. The abbreviation "f. o. b." in the purchase order meant that the defendant was required to load the machine for shipment without expense to the plaintiff.

■ 4. Evidence of oral conversations between the parties prior to and on January 15, 1951, to vary or contradict the contract is incompetent and inadmissible, but may be considered as reflecting upon the intentions of the parties.

5. It was the duty of the defendant under the contract to remove the counterweights and block the heads before shipment, but this was something having to do with preparation for shipment, delay of which had been requested by plaintiff, so that the time for doing it had not arrived, and it did not affect the passing of the title.

For the foregoing reasons, we are of the opinion that the plaintiff has not sustained its case, and that the bill of complaint should be dismissed. An order is drawn accordingly.